**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 08-cv-00578-WJM-CBS

DRY CLEAN SUPER CENTER, INC.,

      Plaintiff,

v.

KWIK INDUSTRIES, INC., a Texas corporation, and
RAY ELLIS,

      Defendants.

_____

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' COMBINED MOTION FOR PARTIAL SUMMARY JUDGMENT**
_____

This matter is before the Court on Defendants' Combined Motion for Partial

Summary Judgment ("Motion for Summary Judgment").  (ECF No. 107.)  The Motion for

Summary Judgment is fully briefed and ripe for disposition.  The Court has original

jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on diversity jurisdiction.

For the following reasons, the Motion for Summary Judgment is GRANTED in part and

DENIED in part.

**BACKGROUND**

**I.      Factual Background**

Unless otherwise noted, the following facts are not in dispute:  In the early 1990s

William Jones ("Jones") had the idea to create a full-service, one-price dry cleaner

service.  (ECF No. 107 at 2.)  He approached his friend Gary Henson ("Henson") about

the opportunity, and they formed Dry Clean Super Center, Inc. ("DCSC").  (ECF No. 107

at 2.)  Shortly thereafter DCSC leased its first dry clean store.  (Pl.'s Br. Opp'n Defs.'
Mot. Part. Summ. J. 1, ECF No. 118.)

Jones approached Defendant Ray Ellis ("Ellis") about the possibility of using the
Kwik Industries, Inc. ("Kwik") model with dry clean stores.  (ECF No. 107 at 2.)  Kwik
offers customers a turn-key product whereby Kwik builds the store, orders and installs
the equipment, assists the buyer in finding financing, and trains the customer on how to
operate the business.  (ECF No. 107 at 1.)  There is no franchise relationship.  (ECF
No. 107 at 1-2.)  Kwik offers this service for car washes, lube centers, laundromats,
and, through its agreement with DCSC, dry cleaning stores.  (Def.'s Resp. Mot. Summ.
J. 1, ECF No. 121.)  among other things, a purchaser of a Kwik product typically pays
for the land, equipment, construction of a building.  (*See* Second Amend. Compl. 5 ¶¶
15-16, ECF No. 63.)  Kwik then receives payments under the terms of the note.  (ECF
No. 107 at 1.)

On September 12, 1996, DCSC and Kwik contracted to be in the business of
building and selling dry clean stores by signing a two-page Letter of Agreement ("LOA")
drafted by Jones.  (ECF No. 107 at 2.)  Under the agreement, Jones and Henson
worked on sales of the dry clean stores while Kwik handled the rest as part of the Kwik
model.  (ECF No. 107 at 2-3.)  Further, Jones and Henson operated out of the Kwik
offices.  (ECF No. 107 at 2.)  Since signing the LOA, Kwik has sold or licensed to
owner-operators approximately 170 stores in about seven states. (*See* ECF No. 63 at 4
¶ 14; Pl.'s Mot. Summ. J. 5 ¶ 12, ECF No. 102; ECF No. 107 at 9 ¶ 25.)

The LOA between Kwik and DCSC stated that the parties would share net profits
from the sale of Dry Clean Super Centers on an equal 50/50 basis, and that they would

2

both share 50 percent of the payments collected from the owner-operator buyer under the promissory note to Kwik.  (*see* ECF No. 107 at 2.)  The LOA also called for monthly payments and a yearly accounting and reconciliation of funds.  (ECF No. 107 at 2.)

In September 1997, Ellis determined that the terms of the agreement, specifically providing annual accounting on a store-by-store basis, was unworkable because of the fact that Kwik worked on many projects at one time and was not set up to do an accounting of each dry clean store when it was working to develop other products at the same time.  (ECF No. 107 at 3.)  Ellis therefore threatened to end the relationship unless there were changes to the agreement.  (ECF No. 107 at 4.)

Ellis contends that at this September 1997 meeting the LOA was orally modified. (ECF No. 107 at 4.)  Henson and Jones, however, claim they did not agree to the changes but insisted on keeping the original LOA in effect.  (ECF No. 118 at 3 ¶¶ 17, 19.)

Following this meeting, monthly advances to Henson and Jones increased to $40,000.  (ECF No. 107 at 4.)  Annual accountings were no longer provided.  (*See* ECF No. 118 at 3 ¶ 20.)  Kwik provided quarterly reconciliations to DCSC and monthly store statements.  (ECF No. 118 at 3 ¶ 20.)  The parties dispute whether these monthly store statements were believed to be representative of all dry clean stores, or just the stores DCSC was involved in selling.  (ECF No. 118 at 4 ¶ 21.)

Kwik contends that this revision clarified the LOA to apply only to stores sold that Jones or Henson had a role in selling.  (ECF No. 121 at 3.)  Kwik did sell stores independently, and did not share the profits from these transactions with DCSC.  (ECF No. 107 at 9 ¶¶ 21-22.)

Throughout the business relationship, DCSC alleges that Kwik tightly controlled the amount of information that DCSC had access to regarding sales of Dry Clean Super Centers, the amount of profit Kwik was receiving from notes, and how much profit Kwik owed DCSC.  (ECF No. 118 at 8 ¶ 7.)  Further, the parties are in agreement that Kwik kept from DCSC information and profits relating to stores that Henson or Jones had not been involved in selling.  (*See id.*)  Kwik also denied DCSC access to financial data on the dry clean stores other than the monthly and quarterly statements.  (ECF No. 118 at 9 ¶ 9.)

The parties further agree that Kwik did not pay DCSC a portion of the profits from stores that Ellis did not believe Henson or Jones "generated." (*See* ECF No. 121 at 7 ¶ 23.)  Nor did Kwik provide a profit share in stores that had been re-purchased by Kwik and sold to another owner-operator.  (*see* ECF No. 118 at 8 ¶ 8.)  Kwik did, however, charge DCSC half of a tax bill based on profits of all of the dry clean stores.  (ECF No. 118 at 12 ¶ 19.)

In 1998 DCSC registered its mark, "Dry Clean Super Center".  (ECF No. 118 at 6 ¶ 33.)  Kwik later registered "Kwik Dry Clean Super Center".  (Reply Supp. Defs' Mot. Summ. J. 7 ¶ 23, ECF No. 131.)

In August 2007 Kwik ceased paying DCSC any monies under the LOA.  (ECF No. 107 at 4.)  Ellis told Henson that this was because Kwik was not getting enough money from the dry clean business to pay Henson.  (*See id.*)  This assertion goes against an accounting given to Henson a year earlier showing an unpaid balance of $6.715 million in outstanding notes. (ECF No. 63 at 12 ¶ 32.)  Henson filed this suit shortly thereafter.  (Compl., ECF No. 1.)

4

Kwik continues to sell dry clean stores independent of its relationship with DCSC. (ECF No. 102 at 6 ¶ 18.)

## II.    Procedural Background

On March 20, 2008, DCSC commenced this action against Kwik, Ellis, and owners and operators of dry clean stores in Colorado.  (ECF No. 1.)  On December 14, 2009, DCSC filed a Second Amended Complaint and Jury Demand (ECF No. 63) against Kwik and Ellis only.  Defendants then filed Defendant Kwik Industries, Inc.'s and Ray Ellis's Answer to Plaintiff's Second Amended Complaint and First Amended Counterclaims on December 31, 2009.  (ECF No. 65.)

DCSC filed Plaintiff/Counter-Defendant, Dry Clean Super Center, Inc's, Motion for Summary Judgment and Motion *in Limine* that Defendants Cannot Prove Existence of a "Revised Agreement" and Memorandum of Support, ECF No. 102, on September 17, 2010.  Kwik and Ellis filed Defendants' Combined Motion for Partial Summary Judgment, ECF No. 107, the same day.  These motions have been fully briefed and were addressed by the Court during oral argument on March 17, 2011.  At the hearing, DCSC's Motion for Summary Judgment on the counterclaims was denied.  Ruling was reserved on Defendants' Motion for Summary Judgment as to the following claims: federal service mark infringement as to both Defendants (claim 1); federal service mark dilution as to both Defendants (claim 2); breach of contract as to Kwik (claim 4); actual, negligent and constructive fraud as to Ellis (claim 5); accounting for profits as to both Defendants (claim 7); declaratory judgment as to Kwik (claim 9); breach of fiduciary duty as to Ellis (claim 11); breach of Texas Partnership Act as to both Defendants (claim 12); and attorney's fees as to Kwik (claim 13).  (Courtroom Minutes, ECF No. 144.)  These

5

issues are currently before the Court.  In all other respects, Defendants' Motion for Summary Judgment was denied.

## STANDARD OF REVIEW

The parties agree that the law of Texas governs the state contract and tort claims in this case.  *Cf. Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").  However, federal law governs the federal claims as well as procedural matters which include the standards for summary judgment.  *See Morris v. Travelers Indem. Co. of Am.*, 518 F.3d 755, 758 (10th Cir. 2008) ("In diversity cases, the laws of the forum state govern our analysis of the underlying claims, while federal law determines the propriety of the district court's summary judgment.").

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248-50 (1986).  A movant who bears the burden at trial must submit evidence to establish the essential elements of its claim or affirmative defense.  *In re Ribozyme Pharms., Inc. Sec. Litig.,* 209 F. Supp. 2d 1106, 1111 (D. Colo. 2002).  By contrast, if the movant "does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001) (internal quotations omitted).  The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that

there is a genuine issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986);

*see* Fed. R. Civ. P. 56(e). An issue is "genuine" if the evidence is such that it might lead

a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119

F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a

court must view the evidence in the light most favorable to the non-moving party. *Id.*;

*see McBeth v. Himes*, 598 F.3d 708, 715 (10th Cir. 2010).

## DISCUSSION

### I.   Statute of Limitations

Statutes of limitations extinguish claims that should be brought in a particular

forum within a particular time. *S.V. v. R.V.*, 933 S.W.2d 1, 3 (Tex. 1996). Plaintiff's

state law claims of breach of contract; actual, negligent, and constructive fraud,

accounting for profits, declaratory judgment, breach of the Texas Partnership Act, and

attorney fees are all subject to a four-year limitation. *See Exxon Corp. v. Emerald Oil &*

*Gas Co., L.C.*, ___ S.W.3d ___, No. 05-1076, 2010 WL 5133461 *4 (Tex. Dec. 17,

2010) (subject to revision or withdrawal) ( fraud); *Nw. Austin Mun. Util. Dist. No. 1 v.*

*City of Austin*, 274 S.W.3d 820, 836 (Tex. App. 2008) (declaratory judgment); *Seureau*

*v. ExxonMobil Corp.*, 274 S.W.3d 206, 227 (Tex. App. 2008) (breach of contract) *Shell*

*Oil Co. v. State*, 442 S.W.2d 457, 459 (Tex. App. 1969) (accounting for profits); Civ.

Prac. & Rem. §§ 16.004, .051 ("Every action for which there is no express limitations

period, except an action for the recovery of real property, must be brought not later than

four years after the day the cause of action accrues.").

The statute of limitations begins to run once a claimant knows "or in the exercise

7

of reasonable diligence should have known of the wrongful act and resulting injury."

*S.V.*, 933 S.W.2d at 4.  In Texas, a plaintiff does not have to know all of the essential

facts before a cause of action accrues.  *In re Jordan*, 249 S.W.3d 416, 422 (Tex. 2008).

Once a claimant knows of an injury, the statute of limitations begins to run even if the

claimant does not yet know "the specific cause of the injury; the party responsible for it;

the full extent of it; or the chances of avoiding it."  *PPG Indus., Inc. v. JMB/Houston*

*Ctrs. Partners L.P.*, 146 S.W.3d 79, 93-94 (Tex. 2004).  Once a party is "on notice" of

the injury, the party "must exercise reasonable diligence to investigate the suspected

harm and file suit, if at all, within the limitations period."  *Id.* (citing *HECI Exploration Co.*

*v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998).

In *S.V.*, the Texas Supreme Court highlighted instances where the claimant

should have known of an injury creating a cause of action.  933 S.W.2d at 5.  *See*

*Kelley v. Rinkle*, 532 S.W.2d 947, 949 (Tex. 1976) (false and libelous credit report

unsuspected until plaintiff refused credit; held discovery rule applies despite strong

counterargument based on "intangible nature of the evidence and of the injury"); *Quinn*

*v. Press*, 140 S.W.2d 438, 441 (Tex. 1940) (held fraud action accrues from time of

discovery, not when damages ascertained with certainty).

The date a cause of action accrues is a question of law.  *Exxon Corp.*, 2010 WL

5133461 at *4; *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex.

2003); *Villarreal v. Wells Fargo Brokerage Servs.*,315 S.W.3d 109, 119 (Tex. App.

2010) ("[I]f reasonable minds could not differ about the conclusion to be drawn from the

facts in the record, the start of the limitations period may be determined as a matter of

law.").

There are two exceptions to the tolling of the statute of limitations:  fraudulent

concealment and the discovery rule.  Generally,

> accrual of a cause of action is deferred in cases of fraud or in which the
> wrongdoing is fraudulently concealed, and in discovery rule cases in which the
> alleged wrongful act and resulting injury were inherently undiscoverable at the
> time they occurred but may be objectively verified.

*S.V.*, 933 S.W.2d at 6.  The fraudulent-concealment doctrine resembles equitable

estoppel and prevents a defendant from relying on limitations when the defendant was

obligated to make a disclosure but "fraudulently concealed the existence of a cause of

action." *Seureau*, 274 S.W.3d at 228.  This estoppel effect "ends when a party learns of

facts, conditions, or circumstances that would cause a reasonably prudent person to

make inquiry which, if pursued, would lead to the discovery of the concealed cause of

action." *Id.*  The discovery rule, on the other hand, has been applied where there was a

special relationship between the parties, such as an attorney-client relationship.  *See*

*S.V.*, 933 S.W.2d at 5.  However, "when the fact of misconduct becomes apparent it can

no longer be ignored, regardless of the nature of the relationship."  *S.V.*, 933 S.W.2d at

8.

This Court does not reach the question of fraudulent concealment or the

discovery rule because Plaintiff had actual knowledge of Defendants' alleged wrongful

actions and that those actions were injurious to Plaintiff's interests.

Defendants argue that a cause of action accrued at the end of each year,

beginning in 1997, when Defendants did not provide the annual accounting as required

under the LOA:

> At the end of 1997, and every year thereafter, DCSC (1) was aware that Kwik was not going to provide to DCSC an accounting of the alleged dry clean store net profits as set forth in the [LOA]; (2) suspected that such store-by-store profits existed; and (3) knew that Kwik was not paying to DCSC the profits that DCSC suspected existed.

(ECF No. 107 at 8 ¶ 20.)  Each time a payment was missed, a cause of action accrued as to that payment.  *Townewest Homeowners Assn. v. Warner Commc'n Inc.*, 826 S.W.2d 638, 640 (Tex. App. 1992).

Defendants point to facts showing that DCSC was aware, by 1999, of Kwik's sales of dry clean stores outside of the LOA.  (ECF No. 107 at 9 ¶ 21; ECF No. 131 at 3 ¶ 21.)  Henson's own deposition testimony recognizes that Kwik sold dry clean stores for which DCSC did not see contracts.  (*See* ECF No. 118 at 4 ¶ 21.)  Further, in 2000, DCSC had evidence in the form of a deduction from a check request that it was not receiving profits from all of the dry clean stores.  (ECF No. 107 at 9 ¶ 23.)  Plaintiff argues that Defendants concealed the fact of these other dry clean stores.  (ECF No. 118 at 4 ¶ 21.)  However, in 1997 and thereafter, DCSC expressed interest in seeing Kwik's dry clean store accountings because DCSC was concerned for its interests.  (*See* Dep. Gary Henson 158:8-160:9, ECF No. 118-11.)  DCSC should have pursued its legal claims at this time, when it first suspected it was not getting all of the facts from Kwik.

Defendants have conclusively shown that Plaintiff's state law claims of breach of contract; actual, negligent, and constructive fraud; accounting for profits; declaratory judgment; and attorney fees claims are limited by Texas limitations statutes.  Because

Plaintiff delayed bringing suit against Defendants until after the limitations period had passed, Plaintiff is precluded as a matter of law from seeking damages on that part of these state law claims that accrued prior to March 20, 2004.

## II.   Alter Ego

In the Motion for Summary Judgment, Defendant Ellis argues that the Breach of Fiduciary Duty and Breach of the Texas Partnership Act claims should be dismissed in their entirety because 1) Ellis is not a party to the contract, or 2) because Ellis cannot be held as a party to the contract through an alter ego theory since alter ego was not specifically pled.  (*See* ECF No. 107 at 19-20; ECF No. 131 at 16-17.)  Plaintiff argues that Kwik is Ellis's alter ego and that a "unity exists between Kwik and Ellis that Kwik ceases to be separate" and therefore Ellis should also be held liable under these two causes of action.  (ECF No. 118 at 27.)

The Texas Rules of Civil Procedure require that a pleading contain "a short statement of the cause of action sufficient to give fair notice of the claim involved."  Tex. R. Civ. P. 47(a).  In Texas, the fair notice pleading standard "looks to whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant."  *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000).  "A petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim."  *Id.* at 897 (quoting *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982)).  Courts construe the pleadings liberally in favor of the pleader.  *Id.*  Further, courts "should uphold the petition as to a cause of action that may be reasonably inferred from what is specifically stated,

11

even if an element of the cause of action is not specifically alleged." *Boyles v. Kerr*, 855 S.W.2d 593, 601 (Tex. 1993).

The Court acknowledges that under Texas law the alter ego claim is generally a separate claim to be pled. *Id.* Based on the actual text of the pleading in question, however, ECF No. 63, it can be reasonably inferred that Plaintiff is, in relevant part, pleading that Ellis is the alter ego of Kwik. *See id.* In Plaintiff's Second Amended Complaint, Plaintiff alleges that Kwik and Ellis "strictly control[led] Plaintiff's access to information," *id.* at 8 ¶ 23, Ellis controlled all DCSC check requests, *id.* at 8 ¶ 25, and Ellis primarily handled all of the financial aspects of each dry clean store sold, *id.* at 8 ¶ 21.

Defendants can reasonably infer an assertion of a separate alter ego claim from the allegations alleged against Ellis in the complaint. *See Boyles*, 855 S.W.2d at 601. Therefore, there is a genuine dispute of material fact as to whether Ellis should be held liable on the claim of breach of fiduciary duty and breach of the Texas Partnership Act. Summary judgment on these claims, as to Defendant Ellis, will therefore be denied.

## III.   Trademark Infringement

Plaintiff asserts that Defendants' use of the "Dry Clean Super Center" mark without Plaintiff's permission establishes a federal service mark infringement claim under the Lanham Act, 15 U.S.C. § 1114(1). Liability attaches when a person, without consent,

> use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection

12

with which such use is likely to cause confusion.

15 U.S.C. § 114 (1)(a).

## A.  Likely to Cause Confusion

The issue of whether the use of a likeness of a registered mark is likely to cause confusion is a determination of fact, but can be decided on summary judgement where appropriate.  *See King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1089 (10th Cir. 1999).  To prevail in its claim for infringement, Plaintiff must show that Defendants' use of the mark is likely to cause confusion.  *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 968 F. Supp. 568, 572 (D. Colo. 1997).

The Tenth Circuit Court of Appeals follows a six-factor test when evaluating likelihood of confusion:

> (a) the degree of similarity between the marks;
> (b) the intent of the alleged infringer in adopting its mark;
> (c) evidence of actual confusion;
> (d) the relation in use and the manner of marketing between the goods or services marketed by the competing parties;
> (e) the degree of care likely to be exercised by purchasers; and
> (f) the strength or weakness of the marks.

*Team Tires Plus, LTD., v. Tires Plus, Inc.*, 394 F.3d 831, 833 (10th Cir. 2005).  No one factor is determinative and all factors must be considered together.  *See Team Tires Plus*, 394 F.3d at 833.  "In every case, however, the key inquiry is  whether the consumer is likely to be deceived or confused by the similarity of the marks."  *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998) (citation

13

omitted).

### *Similarity of the Marks*

The service mark must be evaluated "in the context of the marks as a whole as they are encountered by consumers in the marketplace." *King of the Mountain Sports*, 185 F.3d at 1090. Similarity is based on sight, sound, and meaning. *Id.*; *see also Heartsprings*, 143 F.3d at 554. Where trade names are similar, if they are visually distinct the likelihood of confusion is reduced. *Heartsprings*, 143 F.3d at 554.

Here, Plaintiff argues that Kwik is using both the "Dry Clean Super Center" mark registered to DCSC and the "Kwik Dry Clean Super Center" mark registered to Kwik. Where Kwik uses the DCSC mark, a fact finder could determine there is a likelihood of confusion because the sight, sound, and meaning of the marks is exact.

In the case of the Kwik mark, the wording is similar while the look of the mark is not. (*See* Decl. of Robert M. Frank, PhD. 36, ECF No. 118-30.) The words are the same except for the addition of "Kwik" to the text of the mark. (*Id.*) The look of the Kwik mark differs in that "Kwik" appears in an italic font. However, both marks show "dry clean super center" in all capital lettering spanning two lines. (*See id.*; ECF No. 63 at 15.) While the DCSC mark has "super center" in its own bubble, the Kwik mark has "super center" distinguished by using a different font color.

Kwik's use of the DCSC mark weighs toward a finding of a likelihood of confusion where Kwik used the mark independently of DCSC. Further, the Kwik dry clean mark is similar in sight and meaning and therefore also weighs in favor of a finding of a likelihood of confusion.

14

**Intent of the Defendants**

This factor focuses on "whether defendant had the intent to derive benefit from the reputation or goodwill of plaintiff." *King of the Mountain Sports*, 185 F.3d at 1091 (quoting *Jordache Enters., v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1485 (10th Cir. 1987)). There is no evidence on the record as to the date Kwik began selling dry clean stores independently of the LOA from which a determination of reputation or goodwill can be based.  However, as Plaintiff argues, any goodwill was developed through the joint venture, and by selling stores outside of the joint venture, Kwik likely intended to make a greater profit than would have occurred by pursuing business interest via the LOA only. (ECF No. 118 at 33.)  Therefore, this factor weighs in favor of a finding of a likelihood of confusion.

**Actual Confusion**

Evidence of actual confusion is not necessary in a service mark infringement claim, however "actual confusion in the marketplace is often considered the best evidence of likelihood of confusion." *King of the Mountain Sports*, 185 F.3d at 1092. Here, neither party presents evidence of actual confusion.  Therefore, this factor does not weigh in favor - or against - a finding of a likelihood of confusion.

**Similarity in Service and Marketing**

"The greater the similarity between the products and services, the greater the likelihood of confusion." *Heartsprings*, 143 F.3d at 556 (quoting *Universal Money Ctrs., v. American Tel. & Tel. Co.*, 22 F.3d 1527, 1532 (10th Cir. 1994)).  This is because service and marketing practices are directed to consumers and impact their experience

15

with the service.  *Id.*  Here, Defendants utilized the same service and marketing strategies for sales both within and outside of the LOA.  The only difference would be whether a DCSC representative participated in the contract formation.  Because a customer's experience was nearly identical in both situations, this factor weighs toward a finding of a likelihood of confusion.

**Degree of Care by Purchasers**

"A consumer exercising a high degree of care in selecting a product [or service] reduces the likelihood of confusing similar trade names."  *Heartsprings*, 143 F.3d at 557.  Courts have reasoned that when consumers were selecting a school for physically disabled children, they used a great amount of care because of the fact that they were entrusting their children to the care of the school and because of the significant cost of the school.  *Id.*  Here, the average cost of a dry clean store is over $1 million, ECF No. 107 at 9 ¶ 26.  This would indicate that a consumer would use a great deal of care in knowing who they were contracting with in order to purchase a dry clean store.  This factor weighs significantly against a finding of a likelihood of confusion.

**Strength of the Mark**

There are five categories of service marks: 1) generic; 2) descriptive; 3) suggestive; 4) arbitrary; or 5) fanciful.  *Heartsprings, Inc.*, 143 F.3d at 555.

A generic term is a term used to describe the relevant type or class of goods.  It is the weakest mark and cannot become a trademark under any circumstances.  A descriptive term describes a characteristic of a product or service.  The third, and stronger, mark is the suggestive mark, which suggests rather than describes a characteristic of the product and requires the consumer to use imagination and perception to determine the product's nature.  Finally, the arbitrary or fanciful mark is the strongest

mark.  An arbitrary mark has a common meaning unrelated to the product for which it has been assigned, such as APPLE when applied to computers, while a fanciful mark, such as KODAK or EXXON, signifies nothing but the product.

*Heartsprings*, 143 F.3d at 555.  The stronger the mark, the greater the likelihood there will be of confusion.  *King of the Mountain Sports*, 185 F.3d at 1093.  Where a mark is weak, "minor additions may effectively negate any confusing similarity."  *King of the Mountain Sports*, 968 F. Supp. at 576.

Generic marks are ineligible for protection because they "are totally lacking in distinctive quality; they are not entitled to any protection against infringement . . . because according such protection would deprive competitors of the right to refer to their goods by name."  *TCPIP Holding Co., Inc. v. Haar Commc'ns Inc.*, 244 F.3d 88, 93 (2d Cir. 2001); *see also Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1216 (10th Cir. 2004).  A descriptive mark is eligible for protection only if it has acquired a "secondary meaning."  *Donchez*, 392 F.3d at 1216.  The categorization of a mark is a factual question.  *Id.*

Plaintiff argues that the fact that it is registered shows that its mark is not generic.  (ECF No. 118 at 33.)  Plaintiff's expert opinion further asserts that the service mark has acquired a secondary meaning.  (ECF No. 118-30 at 40.)  However, this secondary meaning does not mean that the mark is distinctive and strong.  *See King of the Mountain Sports*, 968 F. Supp. at 576.  Defendant asserts, and Plaintiff does not dispute, that Plaintiff's mark is descriptive.  (ECF No. 107 at 31.)  The Court agrees that Plaintiff's mark is descriptive, and therefore, not very strong.  This factor weighs in favor

of a finding of a likelihood of confusion.

### B.  Alternate Arguments Against a Finding of Infringement

Defendants argue, in addition, that summary judgment is appropriate because the parties are involved in a joint venture that precludes confusion about the source of the service and because Defendants claim DCSC acquiesced to Defendants' use of the mark.  (ECF No. 107 at 23-27.)  Further, Defendants argue the claims are barred by latches. (*Id.* at 27-29.)

### *Joint Venture and Acquiescence*

Defendants rely on the fact of the joint venture to preclude the infringement claim.  Defendants argue that because of the joint venture, consumers should reach the conclusion that DCSC and Kwik are working together, which is contrary to a confusion argument.  (ECF No. 107 at 23.)  Further, Defendants argue that Plaintiff has acquiesced in Defendant's use of the mark through the joint venture.  (*Id.* at 26.)  However, Defendants ignore Plaintiff's claim that the use complained of is that use by Defendants occurring outside of the joint venture and for the benefit of Kwik and Ellis only.  Further, while Plaintiff either knew or should have known of Defendants' use of the mark outside the terms of the LOA, Defendants did attempt to hide this use.  The Court finds that the parties' involvement in a joint venture, by itself, is not an independent basis upon which to grant summary judgment on Plaintiff's infringement claim.

***Latches***

Defendants also argue that latches bars Plaintiff's service mark infringement claim.  Latches consists of "(1) inexcusable delay in instituting suit; and (2) resulting prejudice to defendant from such delay." *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 523 (10th Cir. 1987).  As discussed above, Plaintiff knew or should have known that Defendants were selling dry clean stores outside the LOA by 1999.  (*See* ECF No. 118 at 4 ¶ 21.)  However, the "mere passage of time cannot constitute latches." *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 686, 704 (2d Cir. 1970) (a fourteen-year delay in bringing suit is not dispositive).

A court must find that the passing of time "lulled the defendant into a false sense of security, and [that] the defendant act[ed] in reliance thereon." *Id.* (citing *Friend v. H.A. Friend and Co.*, 416 F.2d 526, 533 (9th Cir. 1969)).  In *Carl Zeiss Stiftung*, the court held that where plaintiffs were "asserting and prosecuting their rights," defendants were not "lulled into a false sense of security [n]or acted in reliance thereon." *Id.*

Here, Defendants assert that allowing Plaintiff to proceed on its claim for service mark infringement would be prejudicial.  However, Defendants fail to provide evidence of such prejudice.  Similarly, Plaintiff stands on its assertion that it did not know of the cause of action until 2007.  Because there is not enough evidence from either party to conclude latches as a matter of law, this defense is also not an independent basis upon which to grant summary judgment on Plaintiff's infringement claim.

The Court finds that a genuine issue of material fact exists as to whether Defendants' use of the "Dry Clean Super Center Mark" is likely to create confusion

19

among the public.  Therefore, summary judgment is not appropriate on Plaintiff's federal

service mark infringement claim.

## IV.    Dilution

Finally, Plaintiff asserts that Defendant's use of the "Dry Clean Super Center"

mark has diluted its mark under the Trademark Dilution Revision Act of 2006 ("TDRA"),

15 U.S.C. § 1125(c).  Injunctive relief is available where

> the owner of a famous mark that is distinctive, inherently or through
> acquired distinctiveness, shall be entitled to an injunction against another
> person who, at any time after the owner's mark has become famous,
> commences use of a mark or trade name in commerce that is likely to
> cause dilution.

15 U.S.C. § 1125(c)(1).  A famous mark "is widely recognized by the general consuming

public of the United States."  15 U.S.C. § 1125 (c)(2)(A).  Courts consider four factors in

determining the fame of a service mark: 1) duration, extent, and geographic reach of

advertising and publicity of the mark; 2) amount, volume, and geographic extent of

sales; 3) extent of actual recognition of the mark; and 4) whether the mark was

registered.  *Id.*

In considering the fame of DCSC's mark, this Court finds that no reasonable fact-

finder could conclude that the "Dry Clean Super Center" mark is "famous", and therefore

summary judgment is appropriate on the federal service mark dilution claim.

### *Geographic Reach of Mark and Extent of Sales*

The first two factors focus on sales and advertising according to a geographic

reach.  Moreover, Congress, in enacting the TDRA, stated that the mark should be

"recognized by the general consuming public of the United States."  15 U.S.C. §

1125(c)(2)(A).  A service mark cannot be "famous" if it is "famous only in one

geographic part of the United States.  J. Thomas McCarthy, McCarthy on Trademarks

and Unfair Competition § 24:106 (4th ed. 2011).  A court held the Children's Place, a

retail clothing store for children's clothes that had been in business for thirty years and,

in 1999, "operated 228 retail stores in 27 states . . . and achieved sales in 1998 of $280

million" was not able to withstand a preliminary injunction under the Dilution Act.  *TCPIP*

*Holding Co., Inc. v. Haar Commc'ns Inc.*, 244 F.3d 88, 99 (2d Cir. 2001).

Here, the parties agree that dry clean stores using the Dry Clean Super Center

mark are in at least seven states: Texas, Oklahoma, Louisiana, Mississippi, Tennessee,

Kansas, and Colorado.  (ECF No. 63 at 4 ¶ 14; ECF No. 65 at 3 ¶ 14.)  Seven states out

of 50, however, is hardly an extensive geographic reach.  Further, DCSC has been in

business for less than twenty years, and the service mark has only been registered

since 1998.  (*See* ECF No. 118 at 1 ¶ 4; 6, ¶ 33.)  Based on the first two factors of

fame, the DCSC service mark does not meet the level of fame necessary for protection

under the Trademark Dilution statute.

### Recognition

The third factor addresses whether a mark is within the knowledge of "the

general consuming public of the United States."  15 U.S.C. § 1125(c)(2)(A).  Marks held

to be "famous" include AOL, Barbie, Ford, Nike, Pepsi, Porsche, Starbucks, Toys 'R Us,

and Visa.  *See* McCarthy, *supra*, §§ 24:107-108.  Marks held not to be "famous" include

the Blue Man Group, Clue board game, and the Children's Place retail stores.  *Id.* at §§

24:109-110.  Famous marks are "representative of the best known marks in commerce." *TCPIP Holding Co.*, 244 F.3d at 99.

Plaintiff has not shown that its advertising in newspapers, on the internet, and through trade shows has made "Dry Clean Super Center" a "famous" brand.

*Registration*

While DCSC's mark was registered in 1998, this factor does not outweigh the preceding three factors and thereby make the mark "famous."  The factors are "weighed independently and it is the cumulative effect of these considerations which will determine whether a mark qualifies for federal protection from dilution."  McCarthy, *supra*, § 24:106 (quoting Senate Judiciary Committee Report on S. 1883, S. Rep. No. 100-515, at 42 (Sept. 15, 1988)).  The DCSC mark's registration, in and of itself, cannot preclude a granting of summary judgment on the claim of trademark dilution.

## CONCLUSION

It is therefore **ORDERED** that Defendants' Combined Motion for Partial Summary Judgment, ECF No. 107, is GRANTED in part and DENIED in part as follows:

*Statute of Limitations*

Defendants' Motion for Summary Judgment barring claims accruing prior to March 20, 2004 is GRANTED as against Kwik with respect to breach of contract (claim 4); as against Ellis with respect to actual, negligent, and constructive fraud (claim 5); as against both Defendants with respect to accounting for profits (claim 7); as against Kwik with respect to declaratory judgment (claim 9); as against Kwik with respect to breach of

the Texas Partnership Act (claim 12); and as against Kwik with respect to attorney fees (claim 13);

**_Alter Ego/Breach of Fiduciary Duty/Texas Partnership Act (as against Ellis)_**

Defendants' Motion for Summary Judgment against Ellis with respect to breach of fiduciary duty (claim 11) and breach of the Texas Partnership Act (Claim 12) are DENIED;

**_Federal Service Mark Infringement_**

Defendants' Motion for Summary Judgment as against both Defendants with respect to federal service mark infringement (claim 1) is DENIED; and

**_Federal Service Mark Dilution_**

Defendants' Motion for Summary Judgment against both Defendants with respect to federal service mark dilution (claim 2) is GRANTED.

Dated this 8th day of April, 2011.

BY THE COURT:

William J. Martínez
United States District Judge