1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLORADO

3   Civil Action No. 08-cv-00578-WJM-CBS

4   DRY CLEAN SUPER CENTER, INC., a Texas corporation,

5        Plaintiff,

6   vs.

7   KWIK INDUSTRIES, INC., a Texas corporation, and Ray Ellis, an
    individual,

8

         Defendants.

9   _____

10

                       **REPORTER'S TRANSCRIPT**
11                      (Hearing on Motions)

12  _____

13          Proceedings before the HONORABLE WILLIAM J. MARTÍNEZ,

14  Judge, United States District Court for the District of

15  Colorado, commencing at 12:02 p.m., on the 17th day of March,

16  2011, in Courtroom C601, United States Courthouse, Denver,

17  Colorado.

18

19

20

21

22

23

24     Proceeding Recorded by Mechanical Stenography, Transcription
          Produced via Computer by Gwen Daniel, 901 19th Street,
25        Room A259, Denver, Colorado, 80294, 303.571.4084

**APPEARANCES**

1

2          H. Keith Jarvis, Attorney at Law, Markusson, Green &

3   Jarvis, P.C., 950 17th Street, #1050, Denver, CO 80202; and

4   Andrew Jack Kochanowski, Attorney at Law, Sommers Schwartz, PC,

5   2000 Town Center, #900, Southfield, MI 48075, appearing for the

6   plaintiff.

7          Jeffrey D. Felder, Attorney at Law, Brownstein Hyatt

8   Farber Schreck, LLP-Denver, 410 17th Street, #2200, Denver, CO

9   80202; and David S. Chipman, Attorney at Law, Chipman Glasser,

10  LLC, 2000 Colorado Boulevard, #7500, Denver, CO 80222,

11  appearing for the defendants.

12                          *   *   *   *   *

13      (In open court at 10:02 a.m.)

14          THE COURT:  Thank you.  Please be seated.

15          We are on the record in 08-578, Dry Clean Super

16  Center, Inc. vs. Kwik Industries, Inc. et al.

17          I will take appearances of counsel, please.

18          MR. KOCHANOWSKI:  Good morning, your Honor.  It's a

19  pleasure to be here.  My name is Andrew Kochanowski.  I will

20  arguing, together with lead counsel on this, with me is Keith

21  Jarvis.

22          THE COURT:  Good morning, Mr. Jarvis.

23          MR. KOCHANOWSKI:  Also at counsel table is Gary

24  Henson, who is at the representative of Dry Clean Center.

25          THE COURT:  Mr. Henson, good morning.

1          MR. CHIPMAN:  Judge, David Chipman and Jeff Felder on

2     behalf of the defendants.

3          THE COURT:  Mr. Chipman and Mr. Felder.

4          MR. CHIPMAN:  Here behind us, the young lady back

5     there is a parallel, Penny --

6          THE COURT:  Good morning.

7          Before the Court are two motions:  ECF No. 102, Motion

8     for Summary Judgment and Motion *in Limine* filed by the

9     plaintiff; and ECF No. 107, Motion for Summary Judgment filed

10    by the defendants.

11         We're starting a little bit late, so I do not want to

12    deprive counsel of the time that I have allotted, which is an

13    hour.  I do anticipate making some rulings from the bench at

14    the conclusion of oral argument.  So what I would like to do is

15    take 45 minutes total for all argument of counsel and

16    questioning from the Court, and then I'll proceed to making

17    some oral rulings if I continue to believe those are

18    appropriate at that time.

19         I entered an order a few weeks back advising counsel

20    of five questions that I wanted counsel to consider today for

21    oral argument.  This is a large case with a lot of claims.  We

22    obviously don't have the time to discuss them all.  I would

23    like very much for counsel to restrict their comments and

24    arguments to the questions that my law clerk and I selected for

25    discussion today.  Those are the questions we think are most

1   important for the Court to consider and have the assistance of

2   counsel on in terms of making the rulings we believe are

3   important at this stage of this case, which this case is one of

4   my ten oldest cases.  So it has gotten my attention, and we are

5   moving it along, and we are going to continue to move it along.

6          I would like to hear first from counsel for the

7   defendants.

8          MR. CHIPMAN:  Judge, I am going to -- Mr. Felder is

9   going to talk about the first question, I'll handle the second.

10         THE COURT:  That's good.  Thank you.

11         Mr. Felder.

12                  **DEFENDANTS' ARGUMENT ON MOTIONS**

13         MR. FELDER:  Good morning, your Honor.

14         The plaintiff in this case had the burden of coming

15  forward with evidence to show a likelihood of confusion on the

16  trademark issues asserted in the Complaint, and for a number of

17  reasons pointed out in our motion, they have not done so, and

18  also in our reply.  I will just hit on a couple of those issues

19  today.

20         First of all this case presents a unique circumstance.

21  The plaintiff and the defendant, and I am going to call it "Dry

22  Clean Super Center," except I'll take DCSC, and then I will use

23  the term "Kwik" to refer to both Kwik and Ray Ellis to make it

24  easier.

25         So DCSC and Kwik operated a single entity out of

1    Kwik's offices that was selling these dry-cleaning stores that

2    are at issue in this Complaint.  That is an unusual

3    circumstance in a trademark case, because it presents an issue

4    where there is not a typical likelihood of confusion where

5    there is entity A over here, and entity B over here, and

6    there's some question as to whether one entity was infringing

7    on the other entity's mark and how the consuming public

8    perceived that.

9        The second issue that I am going to talk about is what

10   DSSC said in their response brief, which is that there was an

11   implied license for Kwik to use this trademark and that Kwik

12   has exceeded their implied license.

13       The question of this being a unique circumstance

14   regarding this single joint venture is important, because

15   trademark law is only concerned with consumers' perceptions.

16   Trademark law is different from patent law, it is different

17   from all other property rights, in that it does not exist

18   separate from the good will associated with the business.

19       So if someone were to transfer their trademark outside

20   of the good will associated with that mark, that is a naked

21   transfer of rights and it cannot stand under trademark law.

22       So the only thing that matters is what consumers

23   thought.  And here the plaintiff has not come forward with any

24   facts to show that the consumers' perceived this single

25   operation as anything other than one entity providing a single

1    service.  And the undisputed facts show that DCSC, which

2    comprised Mr. Henson and Mr. Jones until 2001, and then just

3    Mr. Henson after that, had their offices and Kwik's offices.

4    The undisputed facts show that Kwik had approximately 30 to 40

5    employees and that Mr. Henson handled the sales aspect while

6    Kwik handled all the other aspects.

7              Excuse me, I am going to grab my water.

8              THE COURT:  Go ahead.

9              MR. FELDER:  As a result the entire business operation

10   was presented to the public as one unit.

11             Now we made this argument in our opening brief, and in

12   response to that argument the plaintiffs did not cite a single

13   case that shows a situation that is similar to this, and I

14   think that that is meaningful, and it's meaningful because it

15   is outside of the scope of a normal context of trademark

16   infringement to say that one business operating as a single

17   entity could have within itself internally infringed its

18   trademark.  It frankly just does not make sense, and that is

19   the argument that we made both in our motion and in our reply.

20             THE COURT:  Mr. Felder, excuse me.  Let me ask you a

21   question.

22             MR. FELDER:  Sure.

23             THE COURT:  Having just described a part of what's

24   going on here, haven't the defendants used the mark outside of

25   the arrangements they had with plaintiff?  So these are stores

1    not covered by the letter agreement.

2          MR. FELDER:  Well, our position is -- certainly our

3    position here is that that is a disputed fact, and Mr. Chipman

4    is going to address that, and that in fact our client amended

5    that agreement, and that in fact those stores that our client

6    sold that DCSC had no participation in and did no work on were

7    outside of that.

8          But to answer your question, and to kind of take a

9    step back, looking at it from the perspective of trademark law,

10   that simply is not an issue, because it depends on what the

11   consumer perceives.

12         So if you are Joe Consumer, who is in the market to

13   purchase a turnkey dry cleaning store, you would not perceive a

14   difference in simply doing business with Kwik or whether you

15   are doing business with the joint venture that was housed in

16   Kwik's offices.  It did not have any distinguishing factors.

17         And, more importantly, the plaintiff has not come

18   forward with any evidence showing that there was anything to

19   distinguish to the public that these were two separate

20   businesses that were operating that could cause confusion to

21   the public.

22         THE COURT:  What about plaintiff's point that -- and

23   the cases the plaintiff cites, that the factual issue of

24   confusion is normally a question of fact for the jury?

25         MR. FELDER:  Well, I think in our brief we cited a

1    number of cases saying -- and including Tenth Circuit case law,

2    saying that regularly the courts on summary judgment resolve

3    the question of likelihood of confusion.

4         So, of course, yes, there can be a question of fact in

5    there, and there are a number of factual factors the Court can

6    go through to make that determination.  But that is not to say

7    that it is exclusively within the province of the fact finder

8    to make that determination.

9         Instead, when there is a dearth of facts alleged, or

10   that the plaintiff has not come forth with sufficient facts, it

11   is appropriate to grant summary judgment on trademark

12   infringement.  And I think the cases we cited show that it

13   happens with some frequency.

14        And then one other thing, to answer your question, to

15   turn this situation around is really to help understand why it

16   is not a trademark issue and instead a contract issue.

17        Let's say that we were sitting here today, and that

18   DCSC had no gripe with how the profits were allotted and

19   distributed over the last 15 years.  Would there be a trademark

20   issue?  Would there be a confusion of consumers?  Nothing would

21   have changed.  It's simply an internal contract dispute between

22   these people -- between the plaintiff and defendant behind

23   closed doors that does not affect the perception of the

24   consumer as to the product that they're receiving and,

25   therefore, doesn't implicate trademark law.

1          I am running low on time.  I just wanted to make one

2     other point, which is in the plaintiff's response they argued

3     that this is an issue of exceeding a license agreement,

4     exceeding an implied license.  I encourage the Court to take a

5     look at that argument, because it is not based on any facts

6     that are contained in the record.  They have not cited a single

7     fact and have not come forward with a single fact to show that

8     DCSC ever believed that it had impliedly licensed anything.

9     And that is a fact that they had to come forward with, and they

10    did not do so.  So I would just encourage the Court to look at

11    that.

12          And then also encourage the Court to look at the case

13    that they cited.  **I Can't Believe It's Not Yogurt.   In that**

14    **case there was no implied license involved.  And in fact it**

15    **wasn't even a case regarding exceeding a license, it was a case**

16    **involving a franchise agreement with a license that had been**

17    **terminated and the conduct that happened after the termination**

18    **of the license agreement.**

19          So I'll step down.  But I would just add in closing

20    that they have not come forward with facts sufficient to show

21    that there is a likelihood of confusion.

22          Thank you.

23          THE COURT:  Before you step down, Mr. Felder, the

24    claims that your argument pertains to, if you can help me out,

25    because plaintiff did plead 15 claims.

```
 1            MR. FELDER:  Certainly, your Honor.  I believe it's
 2   Claims 1, 2 and 3 are the trademark-related claims, but I don't
 3   think your Honor requested argument on the trademark dilution
 4   claim.
 5            THE COURT:  Right.
 6            MR. FELDER:  So it's really I believe just Claim 1 and
 7   2.
 8            THE COURT:  Uh-huh.
 9            MR. KOCHANOWSKI:  Does the Court wish for us to
10   respond at this time?
11            THE COURT:  No.  I would like to hear from Mr. Chipman
12   next.
13            MR. CHIPMAN:  Morning, Judge.  I got to hustle.  I've
14   got like ten minutes here to get through a lot of stuff.  I
15   would like to focus probably most my time actually on the
16   statute of limitations question.
17            This is, you know, a case of two sides, I mean two
18   very, very different stories.  For statute of limitations
19   purposes, you know, when it comes to disputed facts we have to
20   take their side on it, and we're prepared to do that.  I think
21   our task isn't to argue about the disputed facts, our task is
22   to look at what was undisputed, clearly undisputed, and what
23   legal significance those undisputed facts have under Texas law.
24            Now like most plaintiffs in this position, they've
25   raised the discovery rule and the fraudulent conveyance --
```

1   excuse me, fraudulent concealment rule to try to toll the

2   statute of limitations.  It is important as a legal question --

3   before I even address the factual ones, as a legal question it

4   is important to identify what Texas law says about this.

5          And all the cases cited by both DCSC and by Kwik agree

6   that the discovery rule and the fraudulent concealment rule do

7   not toll the statute of limitations once circumstances arise

8   which undisputably create knowledge or suspicion of an injury.

9          And I'll rely on the Court and its able clerks to look

10  at those cases and see.  But that is the rule in Texas.

11         And that's frankly the key to the legal analysis.

12  They don't have to know who did what when.  They don't have to

13  know how much money was lost, or how the money was taken from

14  them, or how are they deprived, or how much money in total when

15  that money was deprived.

16         All they have to know under Texas law is that there

17  was an injury.  Any invasion or suspicion of invasion of their

18  rights triggers the statute of limitations under both of the

19  exceptions.

20         Now all three claims rise from -- all of their claims,

21  the state law claims, arise from three basic allegations.  They

22  were deprived of the money they thought they were owed under

23  this joint venture; they did not get an accounting, a full

24  accounting of those profits; and, three, they were deprived

25  kind of a subset of the first one, they were deprived of the

1    funds that Kwik made in transactions in which DCSC was not

2    involved.

3           Now what DCSC does in its brief is it focuses on all

4    of the facts and the issues that they didn't know about.  But

5    that's not what Texas law does.  If you look at page 18 and 19

6    of their response brief, they go through a series of:  We

7    didn't know this.  We didn't know that.  We didn't know this.

8    We didn't know that.

9           Texas law focuses on what they knew.  And we have to

10   look at the undisputed facts of what they knew.  Briefly this

11   is what those facts the are:

12          At that 1997 meeting they quibble about the details,

13   what they knew, and they admitted in their depositions that

14   they knew.

15          Kwik said:  It's too much of a hassle to deal with

16   this accounting stuff.  I don't want to do it.  Kwik isn't

17   going to do it anymore.  And if you don't like it, we'll shut

18   it down.  We'll finish the projects we have, and we'll shut it

19   down.

20          That part is undisputed.  Okay?

21          I request -- I trust the Court and its clerks to look

22   at the law, look at the evidence, look at the deposition

23   testimony, particularly the testimony that we cut and pasted

24   into the reply brief.

25          In that testimony Mr. Henson, the representative of

1   DCSC, admits he knew from 1998, and every year thereafter, that

2   there wasn't an accounting.  He wasn't getting the accounting

3   that he thought he was entitled to under the letter agreement.

4   And he suspected that profits existed that he wasn't receiving.

5   From 1998 forward.

6          Now look at the timing of that testimony, Judge.  That

7   happened in 2008, in early depositions, before there was sort

8   of a break in the case.

9          That happened before he knew he had a statute of

10  limitations problem.  But even after that fact, when he was

11  deposed again, almost a year and a half later -- and I will

12  refer you to his deposition testimony at Exhibit A11, page 159

13  and 160.  He admitted again that he kept going to Ray back in

14  1998, and onward, saying:  Why aren't I receiving the profits

15  from the construction?

16         That's what makes this case so clear, Judge, those

17  admissions in their deposition testimony.  And those are the

18  facts.  That knowledge and those suspicions are what

19  distinguishes this case from that **Shell** case.  If you look at

20  the **Shell** case, **Shell Oil** case that they cite, nothing like

21  that happened.  This case, there's clear admission under oath

22  in testimony.

23         Now, similarly, they knew that Kwik was selling stores

24  on its own without their involvement.  They knew -- they asked

25  for copies of these contracts.  Kwik didn't give them to --

1    didn't give those copies to them.  And they admit, again, and

2    this is in the reply brief, and I think it's on page 13 of the

3    reply brief, they admit they thought that was a breach of

4    contract, back in 1999.  Okay?

5         So in the response brief they submit an affidavit.

6    You've seen the affidavit, it's Exhibit 6.  This affidavit --

7    the affidavit either addresses all these other issues, the

8    details that Texas law doesn't require that they know about

9    before the statute of limitations starts ticking, or it

10    contradicts his deposition testimony.

11         And the Judge has practiced here a long time, you know

12    what a sham affidavit is, we've cited the case.  Those are not

13    to be considered on summary judgment.

14         Okay.  I am just going to quickly run to a couple of

15    the other arguments.

16         THE COURT:  Okay.  I would like you, Mr. Chipman, to

17    address question No. 3, please.

18         MR. CHIPMAN:  Question No. 3.

19         THE COURT:  It had to do with is there a duty of care

20    araising outside of the letter agreement.

21         MR. CHIPMAN:  Yes.  That's what I am addressing now.

22         The economic loss doctrine, the Court is familiar with

23    that doctrine.  In Texas it's relatively similar to the way it

24    is in Colorado.

25         THE COURT:  Right.

1          MR. CHIPMAN:  You know, basically the question is if

2     the remedy sought is a loss or damage to the subject matter of

3     the contract, that's it.  It's barred.

4          Now you asked for factual questions.  They raised two.

5     One, they call it -- they rely on this concept of fraudulent

6     inducement to continue performance, and they rely on this case,

7     the **Regus** case.  I would request that the Court look at that

8     case and see what case that case cited from the northern

9     district of Texas.  It was just wrong.  I mean it was a Rule 12

10    motion.  It happens.  The district judge missed the fact that

11    the case relied upon, the **Formosa** case, had been clarified by

12    the Texas Supreme Court.  And it was very clear that fraud in

13    the inducement to enter into a contract is indeed barred by the

14    economic loss doctrine.

15         The inducement to continue a contract is just fraud,

16    and that is -- excuse me, that is barred by the economic loss

17    doctrine.  Fraud in the inducement to enter a contract is not.

18         We admit that the fiduciary duty claim, I think they

19    raised the issue in their response, is not barred by the

20    economic loss doctrine.  And I think we pointed out that in our

21    reply brief.

22         THE COURT:  Is there a duty of care addressed in the

23    letter agreement?

24         MR. CHIPMAN:  The letter agreement is the contract,

25    Judge.

```
 1          THE COURT:  I understand, but is there any provision

 2    in there referencing a duty of care between the --

 3          MR. CHIPMAN:  Certainly with respect to contractual

 4    relationships, absolutely, and there is -- the contract -- this

 5    is where they tried to break down how they are going to do this

 6    joint venture.  It's the only writing they have.  And there are

 7    other agreements, but it was all based on contract.  You do

 8    this, I do this.  We split the profits.

 9          The economic loss doctrine says, look, if it's a

10    contract case -- and they admit it's a contract case, look at

11    the first sentence in their Motion for Summary Judgment, this

12    is a contract case.  Then we don't get involved in all the

13    fraud stuff, unless there's a duty arising outside the

14    contract.  And the only ones they've identified is the license,

15    which I really don't get, I don't understand.  I think that

16    relates to the intellectual property claims.

17          And the other issue that they raise is this question

18    of fraudulent inducement, not to enter the contract, but to

19    continue the contract.  Texas law is clear that is barred by

20    the economic loss doctrine.

21          Alter ego.  Judge, we shouldn't be dealing with this

22    issue that was never raised until a response to the Motion for

23    Summary Judgment.  It is a separate legal theory, a separate

24    claim that has to be separately pled.  You don't raise that

25    months after discovery is done in response to a Motion for
```

1  Summary Judgment to try to circumvent around the issue.

2          And the Tenth Circuit has ruled on similar sort of

3  last second -- you know, sort of try to get around summary

4  judgment at the last second again, and again, and again.  And

5  we cited those cases to you.  We shouldn't be talking about

6  that.  If we are talking about, it then we need an opportunity

7  to respond.  We need an opportunity to look at it.  We've never

8  considered that issue, because they've never raised that issue.

9          And if you look, Judge -- argument of counsel is not

10  evidence.  You know that.  We all know that.  Please look at

11  the evidence that they cite for this alter ego issue.  It is

12  not what they claim it is.  The idea of a kickback.  Nobody

13  calls it a kickback except for the plaintiffs.  Okay?  It's a

14  legitimate, legal referral fee.  It happens all the time.

15  Okay?

16          And so one other brief example.  You know, they claim

17  that there were times when Ray Ellis paid DCSC out of his own

18  pocket.  Out of 211 payments, maybe that happened five times or

19  four times.  And on each instance there was a pay-back from

20  Kwik.  I mean that's not alter ego.

21          THE COURT:  Which claims would your position affect in

22  terms of the claim against the individual defendant here,

23  Mr. Ellis?

24          MR. CHIPMAN:  I believe they are raising the claim of

25  alter ego with -- to try to avoid summary judgment on the Texas

```
 1   Partnership Act and the fiduciary duty claim against Mr. Ellis.
 2            Do you want me to quickly take a look at the numbers?
 3            THE COURT:  Okay.  So the Texas Partnership Act,
 4   that's Claim 12.  Fiduciary duty is Claim 11.  Is that correct?
 5            MR. CHIPMAN:  That's correct.  That's right.
 6            THE COURT:  Are those the only claims that you're
 7   concerned about in terms of this late raising of the alter ego
 8   issue?
 9            MR. CHIPMAN:  I believe that the other claims, Judge,
10   are encompassed -- the other claims against Mr. Ellis in the
11   motion, the ones we're trying to knock out, those are the only
12   two claims I believe are addressed by the alter ego issue.
13            THE COURT:  Okay.
14            MR. CHIPMAN:  I think the other claims against him are
15   resolved for other reasons, but -- that we're not talking about
16   this morning.
17            THE COURT:  Okay.  Thank you.
18            MR. CHIPMAN:  Finally, Judge -- I think I've got about
19   a minute.  Novation versus modification.  This is their motion
20   now.
21            THE COURT:  Right.
22            MR. CHIPMAN:  We've never argued it's a novation.
23   Novation and modification are two affirmative defenses.  We've
24   always argued its a modification.  They can't force us to take
25   on a novation argument.  It's not a novation.  It's either a
```

1    modification or it isn't a modification.

2          We've identified the elements.  We believe we've

3    raised a material issue of fact with respect to each of those

4    elements, and the Court will see that, you know, if you look at

5    the evidence we cite and the cases we cite.  This isn't a

6    question of novation.

7          We can't be forced to raise a defense of novation.

8    There are different elements, and we're not raising that.

9    We're raising modification.

10          Now the Court's question was, Well, who decides that

11    issue.  I think the answer is, and I think we stated this in

12    the reply brief, if there's a material issue of fact as to

13    whether there was a modification, that issue is an issue of

14    fact for the jury to decide.

15          If the Court determines that there's not an issue of

16    fact, and we can't -- have not presented a *prima facie* case for

17    modification, well, then that's something the Court decides.

18          But if the Court views it that we've established a

19    meeting of the minds, and consideration, and that that's enough

20    to get to the jury, that's the jury's job.  Okay?

21          Thank you, Judge.

22          THE COURT:  Thank you very much.

23          Mr. Kochanowski.  Will you be addressing all five

24    questions?

25                    **PLAINTIFF'S RESPONSE**

1        MR. KOCHANOWSKI:  Yes, your Honor.  I'm an all-purpose

2   lawyer today.

3        THE COURT:  Very good.  Go ahead.

4        MR. KOCHANOWSKI:  I am just going to have to get my

5   notebooks arranged just a tiny bit.

6        THE COURT:  Sure, go ahead and take your time.

7        MR. KOCHANOWSKI:  For a moment, so I can get myself

8   arranged.  I tried to take some notes.  Very good.

9        On the trademark issue, I have to say, your Honor, I

10  do this with some fair frequency on trademarks, and I'm not

11  trying to tout myself, but I mean I've done these before, and I

12  have to say I've never encountered a situation where the other

13  side says, We just don't understand what the issue is.

14        The issue is real obvious, it's -- Quiznos, let's say,

15  runs a sub shop.  Quiznos let's somebody run a franchise.  That

16  somebody doesn't pay their bills.  Quiznos says:  You can't do

17  this anymore.  And the guy running the sub shop says:  Well,

18  I'm going to.  And there's a sub shop with  the Quiznos name on

19  it that is run by somebody.  And the owner of the trademark,

20  Quiznos, says:  You can't do that.

21        And I don't have to prove likelihood of confusion

22  among the public.  The public looks at the Quiznos mark on the

23  sub shop and assumes it's a Quiznos sub that they're going to

24  buy.

25        Whether or not there's a written license or an implied

1   license, that's the only way that a third party can use a

2   trademark, your Honor.

3        I mean so there's no dispute of fact, we, Dry Clean

4   Super Center, have owned the mark since 1998.  We had a venture

5   with the other side, and that venture -- in that venture we

6   permitted them to use the mark on the stores, on some stores.

7   But the implication is -- and you don't have to have a written

8   agreement, and we didn't give the mark away, and we didn't say,

9   You can use it for any purpose.  The implication is you can do

10  it, you can make the public believe that you have -- that

11  there's a Dry Clean Super Center here if you pay us.  That's

12  what a license is.  And whether it's implied, whether it's

13  express, whether it's written, or oral, or it comes out of the

14  creation of the conduct of the parties, it's still a license

15  agreement.

16       Otherwise, if their arguments are to be believed, or

17  assumed, they're admitting they infringed the trademark.

18  Because Mr. Felder is 100 percent dead wrong that trademark law

19  isn't like patent law or isn't like anything else.  If I own a

20  mark, I can prohibit someone from using it.  I mean that is

21  basic bedrock.

22       So here we make two very simple claims.

23       1.  They didn't have permission to use the mark on

24  cases and stores where they didn't pay us, where they didn't

25  pay us the full amount of what we were owed under the Letter of

1   Agreement.  And that encompasses every -- looks like every one

2   of these -- every one of these stores.  They didn't pay us what

3   the Letter Agreement said they should pay us.

4            THE COURT:  Excuse me, counsel.  On the stores that

5   were operating under the joint venture under the Letter

6   Agreement, how could there be any confusion -- picking up on

7   what Mr. Felder argued earlier, how could the public be

8   confused as to those stores?

9            MR. KOCHANOWSKI:  It's simple -- it's simple naked --

10  it's a simple naked taking of a trademark.  Your Honor --

11           THE COURT:  That's a different issue.  I'm talking

12  about confusion.  How can John Q. Public be confused with

13  respect to those stores?  I'll grant you, the other stores are

14  different, and I have some concerns and issues about those.

15  But if you would please address my question.

16           MR. KOCHANOWSKI:  The stores that -- for instance, for

17  instance, Dr. Frank's report, page 34 to 36, we show a store

18  owner from Arvada here, who runs a Kwik Dry Clean Super Center,

19  but on his Web page he says, Well, this is like the other 200

20  stores that are out there.

21           So here is -- the consumer isn't necessarily -- or is

22  not the fellow who brings the suit in to be dry cleaned.  The

23  consumer, according to Mr. Frank, and us, is the potential

24  buyer of the store.

25           So if Dry Clean Super Center -- if Dry Clean Super

1   Center wants to sell its own stores today, its trademark rights

2   have been diluted because there is a misrepresentation about

3   the source of the trademark.

4           Right now, and for many years, Kwik has sold and tried

5   to sell these stores to small business owners who want to

6   operate a dry cleaners.  And as Mr. Ellis testified, Well, they

7   can either use the Kwik Dry Clean name or the Dry Clean Super

8   Center name.  So it's Kwik Dry Clean Super Center or Dry Clean

9   Super Center.  And they go ahead and license those rights

10  through the sale of the store.  So right there you've created a

11  potential -- potential dilution.

12          We have Dr. Frank's report that documents how the Dry

13  Clean Super Center and the Kwik Dry Clean Super Center names

14  are confused in the marketplace with actual confusion.  We have

15  from both the customer -- from a small business owner and on

16  this Arvada site, that's more than enough to go through the

17  litany of confusion.

18          So the question that they want to get at is, Well,

19  isolate the stores that we didn't pay you for, and so on.  And

20  I say:  No, you can't.  If you didn't pay us even a nickel that

21  we should have gotten for every one of these stores, then there

22  is trademark infringement and -- there's trademark

23  infringement, and I think that is the absolute end of the

24  inquiry.

25          And in the this case, your Honor -- I've never seen a

1    situation like this, we are the only ones who have put anything

2    into evidence.

3         We have an unrebutted report from a qualified expert

4    that goes through all the factors the Tenth Circuit requires,

5    the strength of the market, and so on and so forth, and there's

6    not even an answer back.

7         So there can't be anything but a genuine issue of

8    material fact in this record, I mean as a matter of trademark

9    law.

10        THE COURT:  Okay.  I would like you to move on to

11   question 2, please.

12        MR. KOCHANOWSKI:  Yes, your Honor.

13        The defendant takes a statement made by Mr. Henson in

14   a deposition that he suspected that there were profits in 1998,

15   and uses that as the entire basis for the notion that he knew

16   about the wrongs done to him.

17        What they ignore is -- and it was never asked in a

18   deposition, so there's no contradiction, there's no sham

19   affidavits, is what did Ray Ellis tell him after -- when

20   Mr. Henson said, I don't think I'm getting the full profits?

21   And what Mr. Ellis told him repeatedly throughout the years

22   was, We have profits on these stores of about 10 percent.  And

23   that's why that it's called the 10 percent note.  And because

24   you've got 10 percent, because you're getting half of that,

25   you're getting half of your profit.  And that is the answer,

1   and that is the answer you consistently got.  You said:  I want

2   an accounting.  And Ellis said:  We are not set up for an

3   accounting.  So he gave him reconciliations, which were a form

4   of an accounting.

5          But as it later turns out, as it later turns out -- I

6   mean Mr. Henson may have thought Mr. Ellis was exaggerating,

7   maybe he thought he was not entirely honest with him, that's

8   fine.  But as it turns out that Ellis was not telling the

9   truth.  He was not telling the truth in a number of different

10  ways.  And we go through that in detail.  But the point is --

11         THE COURT:  When did Mr. Henson know or when should he

12  have reasonably suspected that Mr. Ellis was not telling the

13  truth?

14         MR. KOCHANOWSKI:  We go through that.  Mr. Henson

15  reasonably suspected in 2007 that he was not getting paid on

16  stores -- on stores that were being sold by Mr. Ellis.

17         THE COURT:  Didn't he testify that in 1998 he

18  questioned whether he was being paid all of the profits the

19  plaintiff was entitled to?

20         MR. KOCHANOWSKI:  He questioned whether he was being

21  paid the profits.

22         THE COURT:  And he asked for an accounting, and Ellis

23  said, We're not set up to do an accounting.  So he suspects

24  that I'm not getting paid, I want an accounting to see if I am

25  getting paid.  Mr. Ellis, the defendant, says, We're not set up

1   to do it, we're not going to give it to you.  How is that not

2   something that you give a reasonable person a question in their

3   mind as to whether they need to follow up, and that maybe their

4   rights are being infringed upon and maybe they shouldn't sit on

5   them for another eight years?

6        MR. KOCHANOWSKI:  If that was the end of the

7   conversation, I would agree with the Court.  But the

8   conversation didn't end there.  The conversation ended -- and

9   this is in the record through his affidavit, because he was

10  never asked any questions.  The conversation went on that Ellis

11  says:  I can't give you an accounting -- whatever that is -- a

12  formal accounting, because we're not set up to do that.  And

13  that would satisfy the inquiry.

14       I mean at that point you say:  All right, either I'm

15  dealing with a fellow I am trusting, because he's my partner in

16  this joint venture, or I'm not.  So the suspicions were

17  allayed.

18       So as it turns out eight years later we learn that

19  they had a sophisticated computer system that tracked all these

20  costs and charges, and you could have figured out quite nicely

21  what the profit was on a first-store basis, and Ellis knew that

22  at the time.  But we didn't know that in 1998 and there's no

23  evidence to suggest that.

24       Same with the profits.  Ellis says:  Okay, because I

25  don't have the store system, this tracking system, I'm going

1   to -- you know, the profits are, and I am telling you this, 10

2   percent.  And they are expressed in this note, in this note

3   that each buyer executes back.  And that's how you are going to

4   get paid, because that represents the 50 percent.

5         Now if he -- what's he going to do at that point?  Sue

6   him to see whether he's telling the truth or assume that his

7   partner is telling the truth and continue on with this venture?

8         As it turns out he wasn't telling the truth, the

9   profit is much higher than that, and he withheld from him the

10  knowledge that he was getting the two percent that we talked

11  about privately, and he withheld the knowledge.

12        And the third thing, there's another source of income

13  here, of revenue here that they don't want to mention, which is

14  the resales, which is the resales of the stores.

15        Ellis consistently told Mr. Henson, We are not making

16  money, okay, it's just a loss.  You know, a store owner goes

17  out of business and hasn't paid note, Ellis would take the

18  store back, and he'd resell it.  He would tell him that it was

19  at a loss, then it was at a loss, and we document one of those

20  situations.

21        We learned only in 2010, by this very expensive

22  forensic accountant, that there were in fact many of these

23  situations, and that they generated several million dollars

24  worth of profits to Kwik, none of which were ever communicated

25  to us.  So there's nothing --

1           THE COURT:  When did your client learn of that?

2           MR. KOCHANOWSKI:  On the resales?  He learned of the

3    profits in 2009 when Thomas -- when -- Steve Thomas?  Stephen

4    Thomas, the forensic accountant, went through all of these

5    papers.

6           THE COURT:  So not until after this lawsuit was filed.

7           MR. KOCHANOWSKI:  That's correct.  We said there have

8    to be resale profits, because we want to get it in the lawsuit.

9    But after the lawsuit was filed we learned that they in fact

10   made money.  And as McHale in her declaration and her report

11   documents, in order to get that information, you have to have X

12   pieces of paper.  And McHale went through X pieces of paper,

13   which we had to get through discovery, none of which Henson was

14   ever -- or Jones were ever given, shown, or given access to,

15   and they were affirmatively lied to by Ellis for these years

16   when they asked the question, What about resale profit.

17          So the Court has to split out these sources of revenue

18   that the LOA called for, payment of notes, payment of resale

19   and profit and equipment, land sales, and so forth.  That's the

20   three sources of revenue.

21          And there is nothing in the record that suggests that

22   Ellis did anything except tell him -- tell Mr. Hanson and

23   Mr. Jones, you know, untrue things.

24          And Mr. Chipman says, Well, Texas law, you know, is

25   such and such.  Well, Texas law also talks about fraud.  Fraud

1   vitiates all of this.  If you've got fraud, that is, if you

2   tell an untrue thing to your partner, you know, that would toll

3   the statute of limitations.  And the full extent of the fraud,

4   actual fraud, was not known until at the earliest 2007 after

5   the partnership broke down and Mr. Henson started going to

6   Ellis says, What -- you know, show me the money.

7          THE COURT:  Well, I've heard enough on this point.  I

8   need you to respond, please, to the remaining questions.

9          MR. KOCHANOWSKI:  Yes, your Honor.

10          On the alter ego -- let me -- well, alter ego.  I

11   disagree with my learned counsel.  Our entire Complaint, the

12   Second Amended Complaint, talks of Ellis being controlling and

13   dominating.

14          All the information and all the activities of Kwik, I

15   mean there are, there are paragraph, after paragraph, after

16   paragraph.  I did not sue Ellis on the notion that he's the

17   alter ego, because I didn't need to.  The Texas Partnership

18   Act, the Texas Partnership Act I believe, you know, let's me

19   sue him as a partner, given these facts and circumstances,

20   without alleging a form of alter ego theory.

21          They say, Well, no he doesn't fall under the Texas

22   Partnership Act.  And we say, Yes, he does.  He does, because

23   he dominated the company, as we set out in the Complaint.  The

24   same with the fiduciary duty.

25          THE COURT:  Please respond to Mr. Chipman's point that

1    the only evidence in the record to support that is argument of

2    counsel.

3         MR. KOCHANOWSKI:  Well, I disagree with that

4    wholeheartedly.

5         We cited testimony from I think Mr. Ellis himself,

6    Mr. Henson, that Mr. Ellis ran the company and took every

7    financial transaction -- every decision was undertaken by him.

8         And I don't want to minimize the fact that Mr. Ellis

9    in this deal did have a two percent, which amended to well over

10   a million dollars, $1.7 million, he calls it a referral, I call

11   it a kickback, it doesn't matter.  He took an interest in these

12   transactions, and at closing he got given back two percent from

13   the lender, which bypassed the corporation, went strictly

14   directly to him.

15        Our position is that two percent should have been

16   disclosed and added to the profit that they should have split.

17   Instead, it went into his pocket.

18        So how that doesn't end up in a breach of fiduciary

19   duty -- or a Texas Partnership Act claim, I simply don't know.

20   It has to.  There's no evidence that he didn't do it.  They

21   just say it was legal.  Maybe it was legal from a corporate

22   standpoint, but it's not legal from the contract standpoint or

23   the fiduciary duty standpoint vis-a-vis his partner, if I keep

24   an extra two percent and I don't disclose it.

25        THE COURT:  Can you address the economic loss rule.

1          MR. KOCHANOWSKI:  Yes, your Honor.

2          Again, I think we disagree with Mr. Chipman and

3    Mr. Felder.  The economic loss doctrine -- I think the **Eastman**

4    **Chemical** case we cited, the **Cass vs. Stephens** case, **Regus**

5    **Management**, which they don't like, because it comes out the

6    wrong way for them, I think is a perfectly, perfectly well

7    reasoned case.

8          **Thompson Advisory Group** case, which we cited.  There,

9    the only thing you need to do to get out of the economic loss

10   or what -- they don't even call it "economic loss," they call

11   it independent -- thank you, David, "independent injury

12   doctrine," is that **in Thompson Advisory** the plaintiff sought

13   punitive damages that were outside the contract, or exemplary

14   damages, and that was good enough to take it up.  We've pled

15   them here.

16         I think our trademark claim is perfectly good to take

17   us out of that, because, for one thing, the trademark didn't --

18   wasn't registered until 1998, two years after the LOA.  So it

19   could not have been part of the LOA.  It's a separate, it's a

20   separate claim with separate injury.  And that is all that the

21   Texas courts look for.

22         All these cases, **Mays** -- you know, I looked at all of

23   them, the defendant's economic loss case law.  Virtually every

24   one of them is an attempt to get out of the Texas -- the

25   consumer protection, the DTPA law, you know, by pleading, Well

1   you negligently published an ad in the paper, or you

2   negligently, you know, did something, and you caused the

3   consumer injury.

4           And the courts say, No, no, no, that's a strict

5   contract case.

6           But in business cases what the Texas courts call

7   contract torts, there are plenty of exceptions, and I think all

8   the cases we cited put us squarely in it.

9           **Formosa**.   In **Formosa**, I disagree.   **Formosa** Plastics

10  Corp. is a perfectly good case for us.   It does talk about

11  fraud, and after the contract is formed, and I think it

12  supports our theory.

13          I don't think that any of the claims, any of the

14  claims against Kwik are barred by the economic independent

15  injury doctrine, which is an economic loss doctrine in most

16  other --

17          THE COURT:   You have about a couple of more minutes.

18  I would like you to address your motion, please.

19          MR. KOCHANOWSKI:   Yes, sir.   Your Honor, bedrock law,

20  you know, you can't come into court and orally say there was a

21  contract, especially when there's a written contract out there

22  that the parties make no objective efforts to document that

23  that contract is done away with.   And here this is what it is.

24          They are trying to sneak in under some sort of theory

25  that Texas law allows oral modifications to the contract.   I

 1    quibble with that as well, but that's neither here nor there.

 2    If the Court -- the bedrock rule is this:  You can't come in

 3    under the statute of frauds and say, We did a deal.  The courts

 4    won't allow it.  If we go to trial there's the parol evidence

 5    rule, which would bar the same thing.

 6         You simply can't say in a court of law - we all know

 7    this - that, you know, as Mr. Ellis is saying here:  I may have

 8    defrauded you, but you let me, because I told you all about it,

 9    and you said okay.  I mean which is essentially what he's

10    saying, as his story changed over -- between these two years,

11    first deposition, interrogatories, second deposition.

12         Every time I said what about -- these mythical

13    conversations kept expanding, according to him, and covering

14    all of these issues.  You know, by the time we were done, this

15    conversation, which Henson and Jones disagree about -- all they

16    say is Ellis said:  I can't do an accounting for you.  And they

17    said:  All right, well -- you know, if you don't agree, I'll

18    run an accounting and we'll stop this right here.  They come

19    back.  We can make the same argument.  They say they said:  No,

20    we're going to go on as we have before.  And Ellis comes back

21    to work the next day.

22         But however that is, even -- it struck me as odd that

23    even the lead case -- about the only case the defendant cite,

24    the **Insearch** case, there the only reason the Court actually

25    went to the issue and said, No, you know, you can take this

1    modification question to a jury, is because the plaintiff

2    didn't raise the statute of frauds.  And the Court noted that.

3    I mean as if, Had you, we would have been barred by it.

4         Here we raise the statute of frauds.  I think the

5    Court has to get by it.  In the **Ganno** case out of Texas, which

6    is probably the most recent case we cited, which is the two law

7    partners in personal injury firm who sue each other, you know,

8    over the dissolution of the firm, the Court says, It's not

9    reasonable that this contract -- from all these facts that

10   these cases can be resolved in a year and decide the statute of

11   frauds that way.  And that's the key.  They don't even bother

12   trying to distinguish that case, because they can't.

13        Here it was not reasonable, your Honor, that this oral

14   agreement, this so-called oral agreement, could have been

15   performed in a year, since every single contract had a note,

16   and every single note was between 20 and 25 years, and I am not

17   even certain whether they had any prepayment provisions.

18        But under those circumstances, and given the fact that

19   they still would have owed Henson and Jones payments for the

20   notes that had been cut in the two or three years prior to this

21   alleged conversation, they could not have been performed in a

22   year.

23        So that's why we say the statute of frauds bars Ellis

24   from trying to explain to a jury how he's allegedly modified

25   this agreement.

```
 1              THE COURT:  Okay.  Thank you very much.

 2              MR. KOCHANOWSKI:  Thank you, your Honor.

 3              THE COURT:  Mr. Chipman, I can give you about three

 4    minutes for a Kwik response.

 5                          DEFENDANTS' REPLY

 6              MR. CHIPMAN:  Well, Judge, Mr. Kochanowski covered a

 7    lot of ground.  I'll jump right to the statute of limitations

 8    issues.

 9              Please look at the evidence cited.  We don't just rely

10    on what Mr. Henson said in his deposition in 2008.  And I

11    disagree, I think if you look at the Texas cases, the Texas

12    cases say if you have a suspicion, you've got to go forward.

13    And he didn't have that suspicion and lose it.  He admitted he

14    had that suspicion that there were profits, and he admitted

15    that he had them every year thereafter.  And if he was

16    frustrated -- and he also stated that he requested accountings

17    from Mr. Ellis at least twice a year, and asked about twice a

18    year since 1998 why he wasn't getting paid the profits.

19              If he's got a problem, and he doesn't think Mr. Ellis

20    is cooperating with him, he's got to do something about it.

21    You can't sit there and have this meeting, and know what

22    Mr. Ellis is going to do, and then decide, You know what, this

23    is a very lucrative venture, and accept millions of dollars as

24    part of this joint venture, until the money finally stops ten

25    years later, and then come back and go:  Oh, by the way, I'm
```

1    owed money from way back here too.  It doesn't work that way,

2    particularly under Texas law.

3            I will rely on the briefs with respect to the statute

4    of frauds issue on the novation issue.

5            THE COURT:  I need you to respond to that now, though.

6    Can you respond on the statute of frauds issue?

7            MR. CHIPMAN:  The exception to the statute of frauds

8    is if the contract can't be performed within a year.

9            THE COURT:  Right.

10           MR. CHIPMAN:  It's clear that this is a contract that

11   will.  In fact within a year Mr. Ellis told them, and he told

12   them, Hey, I am going to terminate this if you guys don't want

13   to move forward.  That's evidence, front and center, that the

14   contract did not need -- could be performed in less than a

15   year.  It didn't have to last more than a year.

16           I recognize that the statute of frauds is in Texas,

17   and I don't think that Mr. Kochanowski somehow misrepresented

18   the cases that applied to it.  I think the exception and the

19   factual application of that exception is where we beg to

20   differ, and I think there's an issue of fact in that regard.

21           THE COURT:  Okay.  Thank you.

22           MR. CHIPMAN:  Okay.  I am sorry, can Jeff -- he's

23   dying here.  Could he just make one comment?

24           THE COURT:  Go ahead.  I'll give you one minute.

25           MR. FELDER:  One comment about Mr. Kochanowski's

1    argument regarding what they said -- what the plaintiff said in

2    their response brief about the implied license.

3          If you take a look at the Complaint it says --

4    paragraph 36 of Dry Clean Super Center's Complaint, quote,

5    "Plaintiff has never licensed its service mark to defendants'

6    Kwik Industries and Ellis," comma, "nor to any individual store

7    owner."

8          So Mr. Kochanowski says that he does these types of

9    cases all the time, and there has to be some sort of license

10   agreement, yet in the Complaint it says that there was no

11   license agreement.  And, you know, I would encourage the Court

12   to look at the fact that there is no evidence and no testimony,

13   and nothing else, to support the fact that there was ever an

14   implied license, and the arguments based on that implied

15   license should not go forward.

16         Thank you.

17                              **RULING**

18         THE COURT:  Thank you.

19         Okay.  I am prepared to rule on some of the claims,

20   having heard the arguments of counsel, having reviewed all the

21   submissions to the Court by the parties and being fully

22   informed.

23         With respect to ECF No. 102, plaintiff Dry Clean Super

24   Center's Motion for Summary Judgment on the counterclaim by the

25   defendant, that motion is denied.  The Court finds that there

1    is a sufficient genuine issue of material fact with respect to

2    the oral so-called revised agreement was intended to be a

3    novation or a modification of the letter agreement, and that is

4    a question of fact to be determined by the jury.

5            With respect to ECF No. 107, defendant Kwik Industries

6    and Ray Ellis' combined Motion for Summary Judgment, prior to

7    oral argument I was prepared to deny that motion with respect

8    to Claims 1 and 2.  After hearing Mr. Felder's able argument, I

9    have decided that I will reserve ruling with respect to Claims

10   1 and 2.

11           With respect to Claim 3, the federal unfair

12   competition, the Court finds there is a genuine issue of

13   material fact with respect to Claim 3 as pled against both

14   defendants, and as a result summary judgment as to Claim 3 is

15   denied.

16           With respect to Claim 5 of actual negligent and

17   constructive fraud, the Court finds a genuine issue of material

18   fact exists with respect to Claim 5 as pled against defendant

19   Kwik and as a result summary judgment as to this claim and this

20   defendant is denied.

21           With respect to Claim 6 of fraudulent concealment, the

22   Court finds a genuine issue of material fact exists with

23   respect to Claim 6 as pled against both defendants, and as a

24   result summary judgment as to this claim is denied.

25           With respect to Claim 8, constructive trust, the Court

1   finds a genuine issue of material fact exists with respect to

2   Claim 8 as pled against defendant Kwik Industries, and as a

3   result summary judgment as to this claim is denied.

4           With respect to Claim 10, unjust enrichment, the Court

5   finds a genuine issue of material fact exists with respect to

6   Claim 10 as pled against Defendant Ellis, and as a result

7   summary judgment as to this claim is denied.

8           With respect to Claim 11, breach of fiduciary duty,

9   the Court find a genuine issue of material fact exists with

10  respect to Claim 11 as it is pled against defendant Kwik only,

11  and as a result summary judgment as to this claim is denied.

12  The Court will reserve ruling on this claim with respect to

13  Defendant Ellis.

14          With respect to Claim 12, breach of Texas Partnership

15  Act, the Court finds a genuine issue of material fact exists

16  with respect to Claim 12 as pled against defendant Kwik

17  Industries only.  The Court reserves ruling with respect to

18  Claim 12 as pled against Defendant Ellis.  And as a result

19  summary judgment as to this claim is denied.

20          With respect to Claim 13 for attorneys' fees, the

21  Court finds a genuine issue of material fact exists with

22  respect to Claim 13 as pled against Defendant Ellis, and as a

23  result summary judgment as to this claim is denied.

24          Claim 14, aiding and abetting breach of fiduciary

25  duty, the Court finds a genuine issue of material fact exists

1    with respect to Claim 14 as pled against both defendants, and

2    as a result summary judgment as to this claim is denied.

3         With respect to Claim 16 for negligence -- I would

4    note for the record that there was no Claim 15 in the Second

5    Amended Complaint, so this should have been denominated Claim

6    15, but we'll use the plaintiff's numbering for purposes of

7    this ruling.  With respect to Claim 16 for negligence the Court

8    finds a genuine issue of material fact exists with respect to

9    Claim 16 as pled against both the defendants, and as a result

10   summary judgment as to this claim is denied.

11        With respect to the following claims the Court hereby

12   takes these matters under advisement and will issue a written

13   ruling at a later date, those being Claim 4 with respect to

14   breach of contract against defendant Kwik Industries; Claim 5

15   with respect to actual negligent and constructive fraud against

16   Defendant Ray -- what's his first name?

17        MR. CHIPMAN:  Ray --

18        THE COURT:  Ray Ellis.  With respect to Claim 7,

19   accounting for profits against both defendants; Claim 9,

20   declaratory judgment against defendant Kwik Industries; Claim

21   12, breach of the Texas Partnership Act -- excuse me, strike

22   that.  So Claim 9, declaratory judgment, we'll issue a ruling

23   at a later date with respect to Claim 9 as against the

24   defendant Kwik Industries; Claim 13 with respect to the

25   attorneys' fees claim against Kwik Industries.

1          To assist the parties in their assessment of the

2     viability and wisdom of exploring settlement in this case in

3     the very near future, earnestly and in good faith, I offer the

4     following:

5          While I am not making a ruling, at this point, in the

6     Court's view the evidence is overwhelming points towards a

7     finding that plaintiff either knew or should have known in the

8     exercise of reasonable diligence of facts giving rise to the

9     causes of action that I just mentioned, Claims 4, 5, 7, 9 and

10    13, such that these claims are more likely than not in my view

11    barred, at least in part, by the respective statute of

12    limitations.

13         Is there anything further from the plaintiff?

14         MR. KOCHANOWSKI:  Yes, your Honor.  I don't believe

15    that the defendant moved for summary judgment on Claim 4, the

16    breach of contract, and in fact -- I mean I think it was

17    conceded there was a genuine issue of fact there.  So to that

18    extent this case -- Claim 4 was never at issue or briefed as to

19    whether Kwik paid under the LOA or a modification of the LOA.

20         THE COURT:  Well, the Court reads the defendants'

21    combined Motion for Summary Judgment as including a request

22    that summary judgment issue with respect to Claim 4 as against

23    defendant Kwik; is that correct?

24         MR. CHIPMAN:  That's correct, Judge under the statute

25    of limitations.

```
 1              THE COURT:  Correct.

 2              MR. CHIPMAN:  That's maybe what the misunderstanding

 3    is.  Our statute of limitations argument applies to all the

 4    claims.

 5              THE COURT:  Right.  And just so the record is clear,

 6    Claims 4, 5, 7, 9 and 13, my comments had to do with the

 7    granting of the Motion for Summary Judgment, at least in part,

 8    on the basis of the application of the statute of limitations

 9    as to those claims.

10              So if your point, Mr. Kochanowski, was that there was

11    no request for summary judgment as a whole against the claim,

12    that's accurate.

13              Is there anything else from the plaintiff?

14              MR. KOCHANOWSKI:  No.  Thank you, your Honor.  We

15    appreciate your guidance and your thoughtful consideration.

16              THE COURT:  You are welcome.  Thank you.

17              Mr. Chipman.

18              MR. CHIPMAN:  No, Judge.  I wrote as fast as I could,

19    but we'll wait for your -- we'll wait and maybe get the

20    transcript.

21              THE COURT:  I anticipated as much.  I am sure you

22    will.  Okay.  If there will be nothing further, we will be

23    adjourned.

24        (Proceedings concluded at 11:09 a.m.)

25
```

1          **REPORTER'S CERTIFICATE**

2          I certify that the foregoing is a correct transcript from

3     the record of proceedings in the above-entitled matter.   Dated

4     at Denver, Colorado, this 29th day of June, 2011.

5

6                                    _____

7                                              s/Gwen Daniel

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25